UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DONALD BURDICK; SUSAN BYINGTON; LISA CARFAGNO; PETER and JANICE ELLIOT, and their marital community; BERNARD E. GOLDBERG; PAUL E. GOLSTEIN; TOM and LaVOE MULGREW, and their marital community; SUSAN ROSEN; MARTIN SILVERMAN; SHARON SILVERMAN; and BARRY and ROBIN STUCK, and their marital community,

Plaintiffs,

v.

ROSENTHAL COLLINS GROUP, LLC, an Illinois limited liability corporation,

Defendant.

NO. 2:11-CV-557

FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF COMMODITIES AND SECURITIES LAWS AND OTHER CLAIMS

## I.  JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction in this action pursuant to 7 U.S.C. § 25(c) and 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a).  Venue is appropriate in this district pursuant to 7 U.S.C. § 25(c).  Many of the acts and transactions described herein occurred in this district.  On information and belief, defendant also conducts business within this judicial district.

## II.  PARTIES

**A.    Plaintiffs**

2.    Donald Burdick is a resident of Mercer Island, Washington.

3.    Susan Byington is a resident of Seattle, Washington.

4.    Lisa Carfagno is a resident of West Hills, California.

5.    Peter and Janice Elliot are residents of Woodland Hills, California.

6.    Bernard E. Goldberg is a resident of Redmond, Washington.

7.    Paul Golstein is a resident of Tarzana, California.

8.    Tom and LaVoe Mulgrew are residents of Brentwood, Tennessee.

9.    Susan Rosen is a resident of Tarzana, California.

10.    Martin Silverman is a resident of Tarzana, California.

11.    Sharon Silverman is a resident of Valley Village, California.

12.    Barry and Robin Stuck are residents of Tokyo, Japan.

**B.    Defendant**

13.    Rosenthal Collins Group, LLC ("RCG") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

## III.  BACKGROUND FACTS

14.    Enrique Villalba ("Villalba") was a resident of Ohio.  Villalba had lived briefly in Washington, where he graduated from law school.  Over time, Villalba got to know the plaintiffs and other investors and convince them to invest millions of dollars with him.

15.    Villalba created an Ohio corporation, Money Market Alternatives, LLC ("MMA"), for the purpose of investing money received from investors. Villalba claimed to have developed a proprietary system that would provide above-average returns for investors while maintaining a risk level equivalent to investments in money market funds.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 2

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

16.     Villalba claimed that he would place plaintiffs' funds in money market accounts that paid interest until his calculations showed the appropriate times each month to enter the commodities market and purchase futures contracts based on the Standard and Poor's 500 index ("S&P 500 futures contracts") for the accounts. Villalba said that the timing of these transactions was based on when 401(k) retirement plans and pension funds entered or left the market. Villalba said that at those precise moments, he would buy or sell S&P 500 futures contracts to take advantage of slight up or down ticks in the price of those contracts. He also claimed that he would place "sell stops" on the trades to limit losses. He explained his system as follows:

> The portfolio seeks to capture a small 1% gain during these monthly positive time periods via the use of the S&P 500 Index contract. By consistently locking in small gains (and sometimes small losses) by moving back to the safety of money market, the portfolio may attain a double-digit rate of return without the same market risk associated with diversified stock or bond portfolios that move with the market itself.

> To further reduce portfolio risk, protective sell stops are utilized. Initially, the stops are placed approximately 2% beneath the initial entry price. As each day passes, the stops are tightened to further reduce risk from external events such as terrorism or poor economic reports.

17.     Villalba received commissions and a percentage of the profits in the accounts as a management fee.

18.     Villalba explained that the trading would be handled by a broker at RCG and that individual accounts for each of the plaintiffs would be established at RCG.

19.     Villalba sent quarterly MMA account statements to each of the plaintiffs describing the alleged activity and gains or losses in their accounts. The account statements differed for each plaintiff in terms of transactions and performance.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 3

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

20.     One of the plaintiffs also requested copies of statements showing the trades at RCG in his account and was provided occasional RCG statements from Villalba. These RCG statements were in the plaintiff's name.  The statements were complete fabrications.

21.     MMA's account statements indicated that Villalba's system was performing well.  Each year Villalba/MMA sent tax forms to the plaintiffs showing that they received substantial money market interest in their accounts and gains from the trades. The plaintiffs paid taxes on those amounts.  The year-end statements for 2008 showed a positive returns ranging from 22% to 33% for plaintiffs' accounts while the Dow Jones Industrial Average was down more than 33%, the S&P 500 index was down more than 38%, and the NASDAQ index was down more than 40%.

22.     Although the statements occasionally showed losses during some months, all of the quarterly statements showed that Villalba's clients made healthy profits. Based on the apparent success of Villalba's program, these clients placed more funds with MMA and referred Villalba to friends and family. As of June 2009, MMA had attracted over $39 million in client funds from approximately thirty-one clients. Several of the plaintiffs ultimately entrusted their life savings to Villalba, including all of their retirement funds.

23.     What Villalba was actually doing with the plaintiffs' money, however, was starkly different than reflected on the account statements.

24.     Villalba did not maintain separate accounts for each of the plaintiffs. Instead, he placed their money into the MMA account at RCG. The money was then used to make highly leveraged trades in futures contracts, including contracts for the S&P 500 index, treasuries, and gold. Villalba traded the investors' funds in the futures market virtually every day, contrary to his statements that most of the time the plaintiffs' money would be invested in money market funds.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 4

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

25. This activity was highly risky. It was not unusual for the MMA account to lose 20% of its value in a given day. Sometimes the losses were substantially worse. On January 31, 2008, for example, the MMA account dropped from a value of more than $585,000 to a value of slightly over $115,000, a decline of more than 80% in a single day. In the two-week period prior to that day, $640,900 had been wired into the account. Thus, in two weeks, more than $525,000 had been lost.

26. A month later, the account was down to slightly more than $130,000. On February 22, 2008 a $50,000 wire transfer was received, followed by a wire transfer of $11 million on February 26, 2008.

27. On March 10, Villalba's high-leveraged trades raised the account value to more than $25 million. Within 10 days, however, that amount would dwindle to $3.3 million. On March 11, the account lost nearly $5 million and dropped in value to approximately $20 million. On March 18, the account lost 55% of its value, bringing the total value down to approximately $9 million. The next day 63% of that amount was lost, plunging the value of the account to approximately $3.3 million. Despite an additional infusion of $500,000 on April 11, by May 6 the account was only worth approximately $254,000.

28. Thus, while the account statements claimed increasing profits, in reality MMA was suffering catastrophic losses – over $10 million in March and April 2008 alone, and over $16 million from 2007 through April 2009. Unbeknownst to plaintiffs and other investors, due to the frenzied trading in the MMA account, their accounts were rendered worthless.

29. Villalba's scheme could not have been accomplished without the assistance of RCG. RCG is a futures commission merchant. Villalba opened the account with the Professional Services Division of RCG. He held himself out as a professional trader even though he was not registered to provide investment advice or sell

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 5

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303 FAX (206) 223-0246

securities or futures contracts to investors. Upon information and belief, the information provided by Villalba to RCG showed that he was not registered as an investment advisor under any state or federal securities act and that he was not registered under the Commodities Exchange Act in any capacity.

30.     After Villalba began trading, RCG assigned a broker to exclusively handle the MMA account. This broker relocated to Cleveland, Ohio, but the funds for the trading continued to be handled through RCG's office in Chicago.

31.     RCG knew that Villalba was using the MMA account to make trades on behalf of investors. Villalba talked about his trips to see investors with the RCG broker. Because the trades for the various investors were made through the MMA account, rather than for the investors individually, RCG also knew that Villalba was operating a commodities pool—an enterprise in which funds contributed by a number of persons are combined for the purpose of trading futures contracts. The MMA commodity pool operated by Villalba was required by law to be registered with the CFTC. Villalba was a Commodity Pool Operator (CPO)—an individual or organization which operates a commodity pool and solicits funds for that commodity pool. As a CPO, Villalba should have also been registered with the CFTC and was required to be a member of the National Futures Association (NFA), a self-regulatory organization for the U. S. futures industry. RCG also knew, or should have known, that Villalba was trading illegally because MMA was not a registered commodities pool and Villalba was not a registered CPO or a member of the NFA.

32.     RCG also knew, or should have known, that investor payments into the MMA fund also constituted a sale of securities under state and federal securities acts. RCG was aware that the MMA fund was not registered and that Villalba was not registered to sell securities.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 6

33.    RCG also knew that Villalba was using money obtained from investors to trade because of the pattern of activity in the account. From 2005 through 2009, there were numerous deposits made to the MMA account that exceeded the net worth and income stated for MMA and/or Villalba when the MMA account was opened.  For example, the MMA account received deposits totaling $1,440,000 in a six-day period in June 2007; $598,000 in a two-week period in November 2007; $640,900 in eight days in January 2008; $11 million on one day in February 2008; $500,000 in one day on April 11, 2008; $965,000 over five days in June 2008; $462,000 over two weeks in September 2008; $390,000 over five days in October 2008; $500,000 over three days in January 2009; and $960,000 in one day in April 2009. It was obvious to RCG that this money was coming from investors other than Villalba.

34.    RCG also allowed Villalba to make trades that were substantially more risky than typically seen in the industry.

35.    Villalba principally traded in S&P 500 contracts. The value of each S&P 500 contract was $250 multiplied by the value of the S&P 500 index. Thus, if the S&P 500 index was 1300, then the value of a contract was $250 X 1300 = $325,000. Villalba purchased all of the contracts on margin.

36.    The exchanges where these contracts were traded typically required traders to have a minimum amount of equity in their accounts before the contracts could be purchased or held overnight on margin. These amounts typically varied between $18,000 and $22,500 for each S&P 500 futures contract during 2007-2009.

37.    The relative amount of equity supporting a purchase on margin is shown by a "leverage ratio," which is calculated by dividing the value of the contracts held in the account by the amount of liquid equity in the account. If an account holds two S&P 500 contracts and has $50,000 in cash in the account, the leverage ratio would

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 7

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

be (2 X $325,000)/$50,000=15:1 (assuming an S&P 500 index value of 1300).  The higher the ratio, the greater the risk of substantial losses in the account.

38.     The maximum leverage using the margin requirements set by the exchanges for maintaining a contract overnight is generally less than 15:1. Conservative traders try to keep leverage ratios between 5:1 to 10:1.  Aggressive traders try not to get beyond 20:1 as a general rule.  Once the leverage ratio is 25:1 or greater, the account is heavily leveraged and at serious risk.

39.     Villalba's trading resulted in extraordinary high leverage ratios. For example, on May 22, 2006, Villalba held 216 contracts totaling $69,409,925 in value supported only by $1,052,347 in equity, a leverage ratio of 66:1. In March 2008, when Villalba lost more than $10 million in the account, the leverage ratio was more than 40:1. At one point the MMA account held contacts valued at more than $377 million on margin during a single day.

40.     RCG knew (or was reckless in not knowing) that Villalba was actively trading almost every day and that his trading was extraordinarily risky and unskilled. RCG knew that Villalba was greatly exceeding appropriate trading parameters particularly since he was trading with other people's money. RCG's compliance reporting should have flagged the MMA account as suspicious because of the high volume of activity, high leverage, number of overnight holdings, influx of large deposits that clearly did not originate with Villalba (given the profile for Villalba and MMA maintained by the RCG compliance department), and huge trading losses. The MMA account went through several cycles where (1) large sums of money would be deposited, (2) much of those funds would be lost through aggressive trading, (3) there would be a period of little activity where the account value could be as low as a few hundred dollars, followed by (4) another large deposit and (5) a repeat of the

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 8

cycle. Villalba's investors lost more than $30 million over several of these cycles during the time that MMA maintained an account with RCG.

41.     RCG had seen similar activity before. In 2003, George Hudgins opened the first of several trading accounts in his own name at RCG. Hudgins, like Villalba, convinced investors to give him money to invest on their behalf at RCG. Hudgins, also like Villalba, pooled his investors' money to trade futures contracts. RCG permitted Hudgins, like Villalba, to execute high volume, losing trades in his personal accounts with investor funds even though RCG knew that Hudgins was improperly operating an unregistered Commodity Pool.

42.     In May 2008, the Commodities Futures Trading Commission ("CFTC") filed a complaint against Hudgins for violations of the Commodities Exchange Act.  This resulted in entry of a consent order finding that from June 2001 through May 2008, Hudgins had fraudulently induced investors to invest millions of dollars in a commodity pool that traded commodity futures and options on futures contracts in his accounts at RCG with losses totaling $30 million.

43.     During the course of its investigation of Hudgins, the CFTC also determined that RCG violated the CFTC's regulations.  The CFTC found that:

> The evidence establishes that during the relevant period, RCG failed to supervise diligently the handling of Hudgins' accounts by its employees when they took insufficient action to obtain information about Hudgins' identity, background, investment objectives, source of income and assets and other relevant information notwithstanding that Hudgins lost $30 million trading futures and options (for which losses he never showed appropriate concern) and deposited and/or wired over $36 million in his RCG accounts, that vastly exceeded the net worth and annual income that Hudgins asserted in the RCG account opening documents. Further, RCG failed to diligently supervise its employees' handling of the Hudgins' accounts when they failed to investigate these

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 9

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303  FAX (206) 223-0246

suspicious activities regarding Hudgins' RCG accounts and report the results to the appropriate authorities.

44.     By May 2008, RCG knew that the CFTC was investigating Hudgins and had filed a complaint against him for the same type of trading activity and operation that was being conducted by Villalba.

45.     RCG, however, also chose not to investigate the MMA account. RCG did not take any action regarding the account until it received a telephone call from one of Villalba's clients in April 2009. This client told RCG that Villalba had told her that he was unable to send money from her account at RCG because it was not available. She did not believe Villalba and called RCG to confirm that the money was missing. Despite this clear indication of continuing wrongdoing, RCG did not make any report to the authorities.

46.     The response made by RCG to this call was to submit a form to Villalba to update information on the account, which Villalba never returned. RCG made no effort to determine the full circumstances regarding the account and took no other action.

47.     RCG decided that it would rather continue to make huge commissions and fees from Villalba's trading than to take any action that might stop Villalba's irrational trading. In the enforcement action against RCG related to the Hudgins matter, the CFTC expressed concern that RCG and its agent "received hundreds of thousands of dollars in commissions from Hudgins' trading" and ordered RCG to disgorge the $618,526 in commissions received from Hudgins' accounts, in addition to paying a $780,000 fine.

48.     From January 2006 through April 2009 the charges assessed in the MMA account were: (1) commissions of at least $861,502, (2) "Executive Service Fees" of at least $164,445, and (3) other fees of at least $226,087—a total of more than $1.25 million.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 10

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

49.     The plaintiffs had no knowledge that anything was amiss. Villalba bombarded them with daily emails discussing the economy and his strategy to stay on top of the market.   He frequently traveled to meet with the plaintiffs. The MMA quarterly statements continued to show that the accounts were doing well. It was not until the fall of 2009 that the plaintiffs suspected there was a problem with their accounts when Villalba stopped communicating with plaintiffs and requests for withdrawals were ignored. It was unclear how much of the millions of dollars supposedly in plaintiffs' "accounts" still existed. By the end of 2009, it appeared that the answer was "none."

50.     In March, 2010, the Securities and Exchange Commission filed a complaint in the United States District Court for the Northern District of Ohio against Villalba for fraud under §10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5  and § 206 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

51.     On that same day, the CFTC also filed a complaint in the United States District Court for the Northern District of Ohio against Villalba for fraud under §4b(a) of the Commodities Exchange Act, 7 U.S.C. § 6b(a).

52.     Also in March 2010, Villalba was indicted for wire fraud and other crimes in the United States District Court for the Northern District of Ohio.

53.     On September 10, 2010, Villalba pled guilty to wire fraud and was sentenced to 105 months in prison and ordered to make restitution. The SEC obtained an order barring Villalba from further association with any investment advisor.  The CFTC case is still pending.

54.     The plaintiffs' losses in this scheme total nearly $14 million in lost principal. That money and additional millions of dollars in interest and dividends allegedly earned on these investments are gone.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 11

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

## IV.  CLAIMS

### A.    The Commodities Exchange Act

55.    Plaintiffs incorporate the allegations of paragraphs 1-54 of this Complaint.

56.    These claims are brought under the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1, *et. seq.*

57.    With respect to conduct occurring prior to June 18, 2008, Section 4b(a)(2)(i)-(iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), made it unlawful

> for any person to cheat or defraud or attempt to cheat or defraud; willfully to make or cause to be made any false report or statement; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

58.    With respect to conduct occurring on or after June 18, 2008, Section 4b(a)(1)(A)-(C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A)-(C), made it unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 12

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

59.     Beginning in at least 1996 and continuing through at least November 2009, Villalba and MMA, in connection with futures trading and purported futures trading, knowingly: (1) misappropriated funds provided by the plaintiffs; (2) solicited investments through fraudulent, material misrepresentations and omissions, including, among other things, material misrepresentations and omissions about Villalba's trading and purported trading on behalf of plaintiffs and the profits allegedly earned in plaintiffs' accounts; (3) made or caused to be made false reports or statements, both written and oral, to plaintiffs; and (4) made or caused to be made fabricated, written FCM statements to at least one plaintiff, all in violation of Section 4b(a)(2)(i)-(iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and in violation of Section 4b(a)(1)(A)-(C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008.

60.     The MMA account at RCG was a "commodity pool," and Villalba was a CPO.

61.     Section 4m(1) of the CEA, 7 U.S.C. § 6m(1), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO.

62.     As set out herein, Villalba and MMA used the mails, or instrumentalities of interstate commerce, through account statements, reports, and solicitations in connection with the Commodity Pool as a CPO while failing to register as a CPO, in violation of Section 4111(1) of the Act, 7 U.S.C. § 6m(1).

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 13

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

63.     Neither Villalba nor MMA qualified for a registration exemption under either the CEA or regulations issued by the CFTC.

64.     RCG knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. RCG did so knowing of Villalba's and MMA's violations of law, and willfully intended to assist those violations in violation of Section 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l).

65.     RCG substantially assisted in the aforesaid violations of law for the purpose of generating substantial commissions and fees for itself by executing trades in the MMA account and accommodating high levels of leverage for Villalba and MMA, while knowing that Villalba was illegally using the MMA account to execute trades for an unregistered Commodity Pool.

66.     RCG was also a primary violator of the CEA because it violated 7 U.S.C. § 6k by permitting Villalba to trade funds received from other investors without Villalba being registered under the CEA.

67.     Plaintiffs were damaged by RCG's unlawful conduct and are entitled to actual damages for the violations of the CEA alleged herein.

**B.      Ohio Securities Act**

68.     Plaintiffs incorporate the allegations of paragraphs 1-67 of this Complaint.

69.     These claims are made under the Ohio Securities Act ("OSA"), Ohio Rev. Code § 1707.01, *et seq.* on behalf of all plaintiffs.

70.     Villalba principally operated his investment scheme from his offices in Ohio. The RCG broker who handled the trades in the MMA account was located in Ohio and the plaintiffs sent money for investing in the MMA program to Villalba in Ohio.  The Ohio Securities Act is applicable.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 14

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

71.     The investments in the MMA fund sold by Villalba to the plaintiffs were unregistered securities. Villalba violated the OSA by, among other things, selling these unregistered securities to the plaintiffs and by failing to register to sell securities or provide investment advice as required by the OSA in violation of Ohio Rev. Code Ann. § 1707.44(A) and (C).

72.     Villalba also violated the OSA by knowingly making, and causing to be made, false representations concerning material and relevant facts in oral and written statements regarding the value of securities and the advisability of investing in, purchasing, or selling securities in violation of Ohio Rev. Code Ann. § 1707.44(B).

73.     Villalba knowingly engaged in acts and practices described in this Complaint that that are declared illegal, defined as fraudulent, or prohibited under the OSA in violation of Ohio Rev. Code Ann. § 1707.44(G).

74.     Villalba also violated Ohio Rev. Code Ann. § 1707.44(M)(1) by (a) employing devices, schemes, and artifices to defraud plaintiffs; (b) engaging in acts, practices, and courses of business that operated as a fraud or deceit upon plaintiffs; (c) acting as principal for the MMA account while knowingly selling interests to the plaintiffs without disclosing to the plaintiffs in writing, before the completion of the transaction, the capacity in which he was acting and obtaining the consent of the plaintiffs to the transaction; and (d) engaging in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative through the acts alleged herein.

75.     RCG, among other things, helped facilitate Villalba's scheme by executing highly leveraged trades for Villalba and permitting Villalba to use its resources to trade on behalf of the plaintiffs and other investors even though RCG knew, or was reckless in not knowing, that the trades were illegal because (1) they were made using funds combined from different investors, and (2) neither Villalba nor MMA was registered to sell securities, trade futures, or provide investment advice for a

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 15

fee. By participating with and aiding Villalba in carrying out Villalba's investment scheme, RCG is liable to the plaintiffs for Villalba's violations of the OSA under Ohio Rev. Code Ann. § 1707.43:

> Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707 of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

76.    RCG is also liable because it received profits in the form of "executive service fees" and commissions from the sale of securities purchased by the plaintiffs in reliance on written statements provided to the plaintiffs that contained material misrepresentations and omissions in violation of Ohio Rev. Code Ann. § 1707.41.

77.    Plaintiffs are entitled to receive as damages the full amount paid by the plaintiffs to Villalba under Ohio Rev. Code Ann. § 1707.43.

**C.    Securities Act of Washington**

78.    Plaintiffs incorporate the allegations of paragraphs 1-77 of this Complaint.

79.    This claim is made under the Securities Act of Washington, RCW 21.20, *et seq.* on behalf of plaintiffs Donald and Mary K. Burdick, Susan Byington, Bernard E. Goldberg, and Barry and Robin Stuck.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 16

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

80.     Villalba violated RCW 21.20.010 by (a) employing devices, schemes, or artifices to defraud; (b) making untrue statements of material fact or admissions of material fact needed in order to make the statements made not misleading; and (c) engaging in acts, practices, or courses of business that operated as fraud and deceit upon the plaintiffs when he sold interests in his unregistered investment program to plaintiffs.

81.     Among other things, Villalba failed to disclose the risks of his investment scheme to plaintiffs, misrepresented that individual accounts had been established for each plaintiff when they were not, and sent fabricated account statements showing that the plaintiffs' accounts were profitable when, in fact, they were not.

82.     RCG was a substantial contributor to and enabler of Villalba's scheme and is liable to plaintiffs under RCW 21.20.430(1).

83.     RCG is also jointly and severally liable for damages under RCW 21.20.430(3) because it materially aided the transactions that violated the Securities Act of Washington and that caused the plaintiffs to suffer damages.

84.     Plaintiffs Donald and Mary K. Burdick, Susan Byington, Bernard E. Goldberg, and Barry and Robin Stuck were damaged as a result of these acts and are entitled to damages, costs, interest from the dates of purchase, and attorneys' fees from RCG.

**D.      Corporations Act of California**

85.     Plaintiffs incorporate the allegations of paragraphs 1-84 of this Complaint.

86.     These claims are made under the Corporations Code of California on behalf of plaintiffs Sharon Silverman, Martin Silverman, Susan Rosen, Paul Golstein, Peter and Janice Elliot, and Lisa Carfagno.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 17

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

87. By the acts described above, Villalba violated Cal. Corp. Code § 25401:

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

88. Villalba is also liable under Cal. Corp. Code § 25501.5:

> A person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate under Part 3 (commencing with Section 25200), that is in effect at the time of the sale or purchase authorizing that broker-dealer to act in that capacity, may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages.

89. RCG is jointly and severally liable for damages under Cal. Corp. Code § 25504 because it materially aided the transactions that violated the California Corporations Code and that caused the plaintiffs to suffer damages.

90. Sharon Silverman, Martin Silverman, Susan Rosen, Paul Golstein, Peter and Janice Elliot, and Lisa Carfagno were damaged as a result of these acts and are entitled to damages, interest, and attorneys' fees.

**E.    Washington Consumer Protection Act**

91. Plaintiffs incorporate the allegations of paragraphs 1-90 of this Complaint.

92. As described above, RCG engaged in unfair or deceptive acts or practices affecting trade or commerce.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 18

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

93.    RCG's misconduct was and is deleterious to the public interest because, among other things, it occurred in connection with its business, was part of a pattern of conduct, and has potential for repetition.  Plaintiffs were damaged by these violations of the Consumer Protection Act, and should receive damages for their losses, treble damages as provided by the Act, and attorneys' fees.

**F.    Negligence**

94.    Plaintiffs incorporate the allegations of paragraphs 1-93 of this Complaint.

95.    RCG was aware, or but for its negligence should have been aware, that money being invested with it by Villalba was actually coming from other individual investors.  RCG owed duties to these investors, including plaintiffs, to ensure that these funds were maintained in separate accounts and handled in accordance with applicable laws and regulations, and that trading was performed in accordance with industry standards.

96.    RCG also had a duty make sure that the transactions made in the account were legal and authorized and that RCG's employees and agents were properly supervised in their handling of the transactions and their monitoring of the account.

97.    The rules and regulations of the CFTC and the National Futures Association and the applicable exchanges provide appropriate industry standards for determining the appropriate standard of care for RCG.

98.    RCG breached its duties to plaintiffs by, among other things, failing to properly supervise its employees and agents, allowing illegal trades to be made from an unregistered commodity pool, allowing illegal trades to be made on behalf of investors by Villalba while knowing that he was not registered to sell securities or futures or provide investment advice, failing to obtain sufficient

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 19

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

information regarding Villalba and MMA and to update the information regularly in accordance with the applicable rules and regulations, failing to be aware of the suitability issues in the MMA account given the number of investors who were participating and the highly aggressive trading taking place, allowing Villalba to engage in transactions on a regular basis that were leveraged far in excess of industry standards, failing to investigate suspicious activity in the accounts, failing to notify authorities when a Villalba client complained to RCG about money missing from her "account," and continuing to encourage excessive and overleveraged trading that resulted in multi-millions of dollars of losses for the purpose of collecting substantial commissions and fees. The acts and omissions were below the standard of care that should have been observed by RCG and RCG was negligent.

99.     Plaintiffs are entitled to damages for RCG's negligence.

## V.  RELIEF REQUESTED

Plaintiffs request that the Court grant the following relief:

1.     That judgment be granted in favor of plaintiffs against RCG for damages on all claims made in this Complaint;

2.     That judgment be granted in favor of plaintiffs for all costs and attorney fees incurred in this action;

3.     That the Court award such equitable relief as appropriate, including restitution, disgorgement, and an award for unjust enrichment;

4.     That judgment be granted in favor of each plaintiff for treble damages against RCG for the maximum amount permitted by the Washington Consumer Protection Act; and

5.     That judgment be entered for such other and further relief in favor of plaintiffs as may be just and proper.

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 20

DATED:  April 6, 2011.

SIRIANNI YOUTZ SPOONEMORE

_____/s/ Chris R. Youtz_____
Chris R. Youtz (WSBA #7786)
Richard E. Spoonemore (WSBA #21833)
Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR DAMAGES
FOR VIOLATIONS OF COMMODITIES AND
SECURITIES LAWS AND OTHER CLAIMS – 21

SIRIANNI YOUTZ SPOONEMORE
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246