UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD BURDICK, *et al.*, | ) | Case No.: 1:11 CV 2571 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| ROSENTHAL COLLINS GROUP, LLC, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Plaintiffs Donald Burdick, Susan Byington, Lisa Carfagno, Peter and Janice Elliot, Bernard E. Goldberg, Paul E. Goldstein, Tom and LaVoe Mulgrew, Susan Rosen, Martin Silverman, Sharon Silverman, and Barry and Robin Stuck (collectively, "Plaintiffs") bring the instant action against Rosenthal Collins Group, LLC ("RCG"). Currently pending before the court is RCG's Motion to Dismiss the First Amended Complaint, Motion to Strike and, in the Alternative, Motion to Transfer Venue. (ECF No. 10.) For the reasons stated herein, the court grants RCG's Motion to Dismiss Plaintiffs' federal claim for violations of the Commodity Exchange Act for failure to state a claim and hereby dismisses the state law claims pursuant to 28 U.S.C. § 1367(c)(3). [1]

## I. BACKGROUND

### A. The Alleged Investment Scheme

This case arises out of failed investments made by non-party Enrique Villalba ("Villalba") on behalf of Plaintiffs, who assert they have lost a cumulative total of nearly $14 million as a result

---

[1] The Motion to Transfer Venue was previously before the Western District of Washington, which granted the motion and transferred the case to this court. (ECF No. 19).

of Villalba's trading activities. (Am. Compl. ¶¶ 14, 54, ECF No. 4.) Specifically, Plaintiffs allege that Villalba solicited them, as prospective investors, to place funds into Money Market Alternatives ("MMA"), an Ohio corporation created by Villalba for the purpose of investing money received from investors. (*Id*. at ¶ 14.) Villalba allegedly represented that he developed a system that would provide above-average returns while exposing investors to minimal risk. (*Id*. at ¶ 15.) According to his alleged system, Villalba would place Plaintiffs'

> funds in money market accounts that paid interest, until his calculations showed the appropriate times each month to enter the commodities market and purchase futures contracts based on the Standard and Poor's 500 index ("S&P 500 futures contracts") for the accounts. Villalba said that the timing of these transactions was based on when 401(k) retirement plans and pension funds entered or left the market.

(*Id*. at ¶ 16.) Villalba asserted that at those "precise moments, he would buy or sell S&P 500 futures contracts to take advantage of slight up or down ticks in the price of those contracts" and then move the funds back to the safety of the money market account. (*Id*.)

According to Plaintiffs, Villalba portrayed this investment strategy, which involved only temporary entry into the commodities futures market, as relatively safe. (*Id*.) Villalba represented that "the portfolio may attain a double-digit rate of return without the same market risk associated with diversified stock or bond portfolios that move with the market itself." (*Id*.) In addition, he stated that protective sell stops would be utilized to limit losses. (*Id*.)

Villalba then explained to Plaintiffs that the actual trading activity of MMA would be conducted through a broker with RCG, a futures commission merchant in Chicago. (*Id*. at ¶¶ 18, 29.) Villalba also stated that each MMA investor would have his or her own account at MMA and RCG. (*Id*.) However, Villalba did not open separate accounts for each individual MMA investor.

(*Id*. at ¶¶ 18, 24.) Instead, he opened a single account at RCG in the name of MMA and pooled the funds of all investors into it. (*Id*.) As of June 2009, Plaintiffs allege that MMA had attracted over $39 million in client funds from approximately 31 clients. (*Id*. at ¶ 22.)

Plaintiffs assert that Villalba "traded the investors' funds in the futures market virtually every day, contrary to his statements that most of the time the plaintiffs' money would be invested in money market funds." (*Id*. at ¶ 24.) This trading practice entailed significantly more risk. (*Id*. at ¶ 25.) Specifically, Villalba maintained MMA's trading account at RCG at "extraordinarily high leverage ratios" that rendered his trading activity "extraordinarily risky." (*Id*. at ¶¶ 39-40.) The "highly risky" trading activity by Villalba resulted in "catastrophic losses" that ultimately led to Plaintiffs' loss of $14 million. (*Id*. at ¶¶ 25-28.) Despite the catastrophic losses incurred by Villalba's trading practices, Plaintiffs allege that Villalba kept them in the dark by sending quarterly MMA account statements falsely portraying gains in what they believed to be their individual accounts. (*Id*. at ¶¶ 19-23.) The 2008 year-end statements provided to Plaintiffs, for example, showed positive returns ranging from 22% to 33%, whereas Plaintiffs assert they actually sustained significant losses. (*Id*. at ¶¶ 21, 25-28.)

In the fall of 2009, Villalba stopped communicating with Plaintiffs and ignored requests for withdrawal of funds from their supposed accounts. (*Id*. at ¶ 49.) That turn of events sparked a flood of litigation. In March of 2010, the Securities and Exchange Commission ("SEC") and the Commodities Futures Trading Commission ("CFTC") initiated separate fraud actions against Villalba in the Northern District of Ohio. (*Id*. ¶¶ 50-51) Villalba was also indicted in the Northern District of Ohio for wire fraud and other crimes. (*Id*. at ¶ 52.) In September 2010, Villalba pled guilty to wire fraud, was sentenced to 105 months in prison, and ordered to make restitution. (*Id*.

at ¶ 53.) The SEC obtained an order barring Villalba from further association with any investment advisor. (*Id.*) The CFTC obtained an order, *inter alia*, barring him from trading commodities or futures thereof in any capacity. *See CFTC v. Villalba*, No. 5:10-cv-00647, ECF No. 26.

In October 2009, Plaintiffs filed suit against Villalba, MMA, and others in the Western District of Washington, and obtained a default judgment for over $20 million in November 2010. *See Burdick v. Villalba*, No. 09-cv-01932 (W.D. Wash.). On April 1, 2011, Plaintiffs initiated the instant action against RCG in the Western District of Washington. (ECF No. 1.) On November 28, 2011, the case was transferred to the Northern District of Ohio. (ECF No. 20.) Several others who entrusted money to Villalba filed similar actions against RCG in Ohio state courts in 2011. *See Pieretti v. Rosenthal Collins Grp., LLC*, No. 2011-CV-0051 (Ohio C.P. Erie Cnty.); *VASA Order of America v. Rosenthal Collins Grp., LLC*, No. CV-11-753705 (Ohio C.P. Cuyahoga Cnty.).

### B. RCG's Role in the Investment Scheme

Plaintiffs initiated the instant action on the basis that "Villalba's scheme could not have been accomplished without the assistance of RCG." (Am. Compl. at ¶ 29, ECF No. 4.) In particular, Plaintiffs assert that RCG permitted Villalba to make investments notwithstanding knowledge that he failed to register as an investment advisor under state and federal securities laws. (*Id*. at ¶ 29.) For example, Plaintiffs allege that RCG knew that Villalba used the MMA account to trade on the behalf of individual investors, and was therefore operating a commodity pool that was required by statute to be registered with the CFTC. (*Id*. at ¶ 31.) It is further alleged that RCG knew or should have known that the investors' payments into the MMA account constituted a sale of securities under federal and state law, and that the MMA fund should have been registered as such. (*Id*. at ¶ 32.) Finally, Plaintiffs allege that "RCG's compliance reporting [department] should have flagged

the MMA account as suspicious because of the high volume of activity, high leverage, number of overnight holdings, influx of large deposits that clearly did not originate with Villalba . . ., and huge trading losses." (*Id.* at ¶ 40.)

Plaintiffs claim that RCG "knew, or should have known, that Villalba was trading illegally" but failed to take action because it was in their financial interest to permit him to continue making trades. (*Id.* at ¶¶ 31, 65.) Plaintiffs bring claims against RCG for violations of the: (1) the Commodity Exchange Act; (2) the Ohio Securities Act; (3) the Securities Act of Washington; (4) the Corporations Act of California; and (5) the Washington Consumer Protection Act; and for (6) common law negligence.

## II. STANDARD OF REVIEW

The court examines the legal sufficiency of a plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and subsequently in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) clarified the law regarding what the plaintiff must plead in order to survive a Rule 12(b)(6) motion.

When determining whether a plaintiff has stated a claim upon which relief can be granted, the court must construe the Complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the Complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a Complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above

- 5 -

the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court in *Iqbal*, 129 S.Ct. at 1949, further explains the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

The Sixth Circuit has held that a court may consider allegations contained in the Complaint, as well as exhibits attached to or otherwise incorporated in the Complaint, all without converting a Motion to Dismiss to a Motion for Summary Judgment. Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997). In addition, "[a] court that is ruling on a 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *Gordon v. England*, 354 Fed. Appx. 975, 978 (6th Cir. 2009) (quoting *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003)). The Sixth Circuit has further held that documents a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's Complaint and are central to her claim. *See Gardner v. U.S.*, 443 F. App'x. 70 (6th Cir. 2011).

### III. ANALYSIS

#### A. Violation of the CEA

1. Aider or Abettor

Plaintiffs must allege that RCG acted knowingly in order to state a cause of action for aiding and abetting liability under 7 U.S.C. § 25(a)(1). RCG argues that Plaintiffs merely assert, without any factual support, that "'RCG knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA[,]' and that 'RCG did so knowing of Villalba's and MMA's violations of law, and willfully intended to assist those violations.'" (Mot. at 16, ECF No. 10.) RCG maintains that the First Amended Complaint does not contain any allegations that "RCG participated in, encouraged, or even knew of the canard Villalba told to plaintiffs with respect to their MMA 'accounts'" or that "RCG communicated with plaintiffs in any fashion during Villalba's fundraising efforts." (*Id*.) RCG contends that

> [t]he only facts plaintiffs plead to support their claim that RCG 'willfully' aided and abetted and provided 'substantial assistance' to Villalba's scheme are that RCG (1) permitted Villalba to open the MMA Commodities Account, (2) 'assigned a broker to exclusively handle the MMA account,' (3) 'relocated' the broker to Cleveland, Ohio, (4) 'handled' the MMA Commodities Account's funds through its office in Chicago, and (5) cleared the commodities transactions entered into by the MMA Commodities Account.

(*Id*. at 16-17.) RCG maintains that these facts merely show that it "was providing usual brokerage services to the MMA Commodities Account, and nothing more," which cannot serve as a basis for aiding and abetting liability. (Mot. at 17, ECF No. 10.)

Plaintiffs assert that the allegations in the First Amended Complaint show

> 1) that RCG knew that the funds being traded in the MMA commodity pool came from outside investors; 2) that neither Villalba nor the commodity pool were registered as required by law; 3) that it was likely that investors were not being told the truth about MMA's disastrous trading practices because substantial deposits continued to come in through Villalba. It is reasonable to infer that experienced commodities traders, such as RCG, would conclude from the trading

- 7 -

> records and other information available to them that to the extent additional money came from existing investors in the fund, they were likely not being told about their extensive losses and if the additional deposits came from new investors, they were not being told about the poor performance of the fund.

(Opp. at 20, ECF No. 13.) Plaintiffs contend that if the fund and Villalba had been registered as required, they would have been required to submit reports with regulatory agencies as well as to the investors, which would have ended the scheme. (*Id*. at 20-21.) However, Plaintiffs maintain that RCG "had a powerful incentive to have the scheme continue," as they received more than $1.25 million in fees and commissions from the pooled funds. (*Id*. at 21.) Plaintiffs argue that their allegations of recklessness are sufficient to support an aiding and abetting claim under the CEA.

The CEA creates a private right of action for "actual damages" caused by "[a]ny person . . . who violates this chapter or who willfully aids [or] abets . . . the commission of a violation of this chapter." 7 U.S.C. § 25(a)(1). The dispute boils down to whether the definition of "willfully" requires knowledge and specific intent, as desired by RCG, or recklessness, as argued by Plaintiffs.

The three circuit courts that have considered this particular question have held that "willfully" as used in § 25(a)(1) requires actual knowledge. *See Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 256 (5th Cir. 2011); *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 189 (3d Cir. 2000); *Damato v. Hermanson*, 153 F.3d 464, 472 (7th Cir. 1998). In reaching its decision, the Seventh Circuit found the elements of aider and abettor liability under § 25(a)(1) to be the same as those necessary under the federal criminal aider and abettor statute, 18 U.S.C. § 2. *Damato*, 153 F.3d at 473; *see also Amacker*, 657 F.3d at 256 (finding the Seventh Circuit's interpretation to be persuasive); *Nicholas*, 224 F.3d at 189 (agreeing "with the Seventh Circuit that aiding and abetting in the context of the CEA is congruent with aiding and abetting as defined by 18 U.S.C. § 2"). It therefore concluded that "in order to state . . . a claim against [a defendant,] . . . plaintiffs must allege that [the defendant] (1) had knowledge of the principal's . . . intent to commit

- 8 -

a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *Damato*, 153 F.3d at 473; *see also Goodman v. Mady*, No. 04-75011, 2005 WL 2417209, at *9 (E.D. Mich. Sept. 30, 2005) (adopting the *Damato* test without explanation). This interpretation is in harmony with both the Sixth Circuit's traditional understanding of what is meant by "aiding and abetting" and with the language of § 25(a)(1) which contemplates liability for one "who *willfully* aids [and] abets . . . the commission of a violation" of the CEA. *See United States v. Davis*, 306 F.3d 398, 409 (6th Cir. 2002) (stating "that aiding and abetting involves (1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission") (citing *U.S. v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995)); *see also Amacker*, 657 F.3d at 256 (citing 7 U.S.C. § 25(a)(1)). The court finds the Seventh Circuit's reasoning persuasive.

In the present case, Plaintiffs allege that RCG knew or recklessly disregarded facts that Villalba was involved in conduct that violated the CEA. Specifically, Plaintiffs point to the trading practices of Villalba, which were alleged to be extraordinarily risky, to support their argument that RCG should have been aware that Villalba was violating the CEA. In addition, Plaintiffs allege that RCG knew or should have known that Villalba was operating an unregistered commodities pool. However, Plaintiffs fail to allege that RCG had the requisite knowledge or guilty intent as required for aiding and abetting in the context of the CEA. *See Nicholas*, 224 F.3d at 189 (finding the same). As stated by the Third Circuit in a case with similar allegations of inadequate supervision of the primary violator, Plaintiffs "alleged, at most, that the [Defendants] acted recklessly," but "these allegations [were] a far cry from an allegation that the [Defendants] not only had knowledge of the intent of the [primary violators] to violate the CEA, but . . . [also], the intent to further that violation." *Id*. at 190; *see also Damato*, 153 F.3d at 473 n.12 (finding that plaintiffs' allegations

suggesting that the defendant was negligent in monitoring an account "do not satisfy the scienter requirement of an aiding and abetting claim under the CEA").

The authorities cited by Plaintiffs do not change this conclusion. Plaintiffs cite *Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990), to demonstrate that their allegations are sufficient to support an aiding and abetting claim under the CEA. However, *Ikuno* is inapposite as it involved an individual who actively assisted his client, a corporation, by filing an annual corporate report preventing it from being dissolved administratively, failing to advise that selling commodities without a license was unlawful, and possibly authoring a letter advising investors to be patient while the corporation was shut down for an audit. Here, Plaintiffs do not allege that RCG assisted Villalba or MMA with communications to their investors or took any other actions to further Villalba's relationship with investors. Plaintiffs cite *In re Western*, CFTC No. 81-18, 1983 WL 29657 (C.F.T.C. Oct. 14, 1983), to demonstrate that "maintaining a business relationship with someone known to be engaged in illegal activity supports aiding and abetting liability." (Opp. at 20, ECF No. 13.) However, this case is also inapposite because in that proceeding, the futures commission merchant ("FCM") had an undisclosed commission-sharing arrangement with a commodity pool operator ("CPO") and therefore knew that in order to be associated with the FCM in this capacity, that the CPO should have been registered. This is readily distinguishable from the instant case where Plaintiffs allege that MMA was merely RCG's customer. Therefore, because Plaintiffs fail to allege that RCG had the requisite knowledge or guilty intent as required for aiding and abetting in the context of the CEA, RCG is entitled to dismissal of this claim on this basis.

<u>2. Primary Violator</u>

Plaintiffs' claim also fails under their alternative theory to support their claim that RCG violated the CEA. Plaintiffs allege that RCG was a primary violator of the CEA because it violated

7 U.S.C. § 6k by permitting Villalba to trade in the commodities market without being registered with the Commodity Futures Trading Commission ("CFTC"). Plaintiffs believe that they would not have suffered losses at the hands of Villalba if RCG properly inquired into his registration status. RCG argues that the CEA imposes no duty upon a broker to inquire into the registration status of one of its customers. Plaintiffs neither dispute RCG's argument, nor do they address the validity of their CEA claim in relation to § 6k. RCG argues in its Reply that Plaintiffs abandoned their claim that RCG violated § 6k. Regardless of whether Plaintiffs abandoned their claim alleging RCG's violation of § 6k, the court finds that Plaintiffs have not stated a claim for relief that is plausible on its face.

Under § 6k(1) it is unlawful for:

> any person to be associated with a futures commission merchant as a partner, officer, or employee, or to be associated with an introducing broker as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions) in any capacity that involves (i) the solicitation or acceptance of customers' orders . . . unless such person is registered with the [CFTC] . . . .

The statute further provides that:

> [i]t shall be unlawful for a futures commission merchant or introducing broker to permit such a person to become or remain associated with the futures commission merchant or introducing broker in any such capacity if such futures commission merchant or introducing broker knew or should have known that such person was not so registered . . . .

As previously determined by the Fifth Circuit, this statute "does not impose a duty on merchants to inquire into the registration status of its customers 'merely because that customer may be acting on behalf of other individuals.'" *Amacker*, 657 F.3d at 257 (quoting *Brown v. Royce Brokerage, Inc.*, 632 F.2d 652, 654 (5th Cir. 1980)). Section 6k(1) imposes liability if a partner, officer, employee or any person occupying a similar status or performing similar function is unlicensed and the merchant knows or has reason to know of the violation. *See* 7 U.S.C. § 6k(1).

Plaintiffs' First Amended Complaint does not suggest, nor do Plaintiffs argue, that Villalba was a partner, officer, employee or any person occupying a similar status or performing similar function at RCG. Unlike a partner, officer, or employee of RCG, Villalba solicited and accepted orders from his own customers, and merely executed those orders through RCG. Plaintiffs do not allege that RCG knew the identity of Villalba's customers, the nature of their accounts, or their investment goals and objectives. They only allege that RCG knew Villalba invested on behalf of other investors. (Am. Compl. at ¶ 31, ECF No. 4.) Therefore, Plaintiffs' claim fails under both of their theories, and RCG is entitled to dismissal of this claim.[2]

### B. State Law Claims

Plaintiffs also allege violations of the following state laws: (1) the Ohio Securities Act; (2) the Securities Act of Washington; (3) the Corporations Act of California; (4) the Washington Consumer Protection Act; and (5) common law negligence. This court had federal question jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367. Section 1367(c)(3) provides that "the district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." Inasmuch as the court has dismissed Plaintiffs' only federal claim, the court exercises its discretion to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

### IV. CONCLUSION

---

[2] RCG also argues that Plaintiffs' CEA claim is not pled with the particularity required by Fed. R. Civ. P. 9(b) and therefore it should be dismissed. Plaintiffs concede that their CEA claim must satisfy the particularity requirements of Rule 9(b), yet do not provide the court with argument demonstrating that their CEA claim meets the requisite requirements. In any event, because this claim fails on another basis, the court need not address this argument.

For the foregoing reasons, the court Grants RCG's Motion to Dismiss (ECF No. 10) as to the federal claim, and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

July 26, 2012